1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CEDRIC W. CONNER,

11              Petitioner,              No. 2:09-cv-01994 KJN P

12        vs.

13   R. BARNES, Warden,

14              Respondent.              ORDER[1]

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding without counsel, with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2007 conviction on

19   one count of second degree burglary and one count of petty theft.  At the sentencing hearing,

20   petitioner agreed to waive his right to appeal in exchange for a sentence of five years and eight

21   months.  Petitioner raises four claims in his petition, filed July 20, 2009, that his prison sentence

22   violates the Constitution.  For the reasons set forth below, petitioner's application for a writ of

23   habeas corpus is denied.

24   ////

25   _____

26        [1]  Both parties consented to the jurisdiction of a Magistrate Judge for entry of final
     judgment.  (Dkt. Nos. 5 and 12.)

II.  Procedural History

On September 27, 2007, the Petitioner was found guilty by a jury of a Second Degree Burglary (Penal Code 459) and Petty Theft (Penal Code 484(a)/666).  Outside the presence of the jury, the trial court found true allegations that the Petitioner had previously suffered certain prior convictions, namely, a strike and three prison commitments (Penal Code 667.5(b)).  His total prison exposure, as convicted, was nine-years.  Following the jury verdict, the case was referred to the Probation Department and a report was prepared that recommended that the petitioner be sentenced to prison for seven years.

On January 2, 2008, the case was calendared for Judgment and Sentencing.  The Defendant had previously filed a Romero motion requesting the trial court exercise it's [sic] discretion to strike one or more of the prior enhancements.  Following the trial, the District Attorney had apparently offered the Petitioner a stipulated prison sentence of five years, eight months in lieu of the likely higher prison sentence the court could impose.  The offer from the prosecution, however, included a requirement that the Petitioner waive his appellate rights [rt 3:12-13][.]

At the sentencing hearing, the trial court informed the petitioner that the court would likely impose the mid-term and sentence the defendant to seven years, thus he was saving over a year and a third by accepting the District Attorney's offer.  [rt 6:2-7]  The trial court informed the petitioner that he could accept the offer or reject it and offered to give the petitioner more time to talk with his attorney.  [rt 4:1-3]  The defendant was informed that his waiver would include everything that occurred pretrial, during trial also sentencing.  [rt 7:1-24]  The defendant acknowledged that he understood the consequences of the waiver and he expressly agreed to and did waive his appellate rights.  [rt 7:1-24]  In accordance with the negotiated sentenced [sic], the trial court sentenced the defendant to five years, eight months in prison.

(Sup. Ct. Op., LD 4, at 1-2 (footnote omitted).[2])

On May 19, 2008, petitioner filed his first state habeas petition in the Placer County Superior Court.  (LD 3.)  He alleged ineffective assistance of counsel and challenged the voluntariness of his appellate waiver.  (LD 3 at 3-4.)  On July 1, 2008, the superior court found

---

[2]  Respondent lodged the state court record herein on June 22, 2010, and February 24, 2011.  Each document is consecutively numbered and referred to in this opinion as Lodged Document ("LD") #.

1  petitioner's wavier included a waiver of the right to seek a writ of habeas corpus and accordingly,

2  found petitioner had waived all claims.  (LD 4 at 3.)

3          On August 4, 2008, petitioner filed a habeas petition in the California Court of

4  Appeal which was denied without comment on August 6, 2008.  (LD 5 and 6.)   On September 8,

5  2008, petitioner filed a habeas petition in the California Supreme Court which, on March 25,

6  2009, was also denied without comment.  (LD 7 and 8.)

7          On July 20, 2009, petitioner filed the instant habeas corpus petition in this court.[3]

8  On November 15, 2010, the undersigned granted in part respondent's motion to dismiss.  (Dkt.

9  No. 24.)   Claims 2(c), 2(d), 2(e), and 2(f) were dismissed as unexhausted.  (Id.)

10  III.  Facts

11          Because petitioner did not appeal, there is no appellate opinion summarizing the

12  facts presented at trial.  Respondent has provided a Statement of Facts, which is quoted below.

13  The court recognizes that petitioner objects to some aspects of this recitation of the facts.[4]

14  Petitioner's objections are noted.

15          In the summer of 2007, Natalie Rankin and her husband
Jason Rankin owned and operated the Sunkissed Tanning Salon on

16  Lone Tree Boulevard in the city of Roseville in Placer County. (LD #9 at 90, 92, 164, 223.) The front door of the salon opened into a

17  lobby with a large counter. (LD #9 at 93-95.) Customers generally stood in front of the counter to pay for services or make an

18  appointment, while an employee sat behind the counter at an adjacent desk and entered those transactions into a computer and

19  cash register. (LD #9 at 95.) A security camera was mounted on the wall of the lobby, but it was not working due to a missing part. (LD

20  #9 at 115, 197.) A hallway extended behind the lobby, where several tanning rooms and a separate office were located. (LD #9 at

21  96.) Next to the front door, there was a window with sheer curtains. (LD #9 at 116.) Consequently, a passerby from one of the

22  nearby businesses, such as Subway, would be able to see into the

23  _____

24  [3] Respondent notes that the petition was filed within the statute of limitations.  (Dkt. No. 30 at 4 n.3.)

25  [4] At one point, petitioner states that respondent's counsel has "gone through great
measures to spin an elaborate and absolute fabricated tale."  (Dkt. No. 32 at 1.)  The court points

26  out that these "facts" are considered here as a recitation of the evidence introduced at trial.

lobby while standing outside the salon. (LD #9 at 90, 116.)

Shortly after 2:00 p.m. on June 30, 2007, Natalie and Jason were both present in the tanning salon with no other employees or customers. (LD #9 at 97, 164.) Natalie was cleaning one of the tanning beds, while Jason was working in the back office. (LD #9 at 97, 164.) Jason heard the front door chime open, followed shortly thereafter by a "bang." (LD #9 at 164-65, 187.) Natalie did not remember hearing the chime, but she did hear the "bang." (LD #9 at 156.) Jason and Natalie both thought the "bang" sounded like the cash register drawer being opened. (LD #9 at 97, 99-100, 123, 165.) Natalie stopped cleaning and walked to the front lobby, while Jason continued working in the back office. (LD #9 at 98, 166.)

Upon entering the lobby, Natalie observed Petitioner, an African-American male, "walking out" from behind the counter near the desk. (LD #9 at 98-99, 124-25, 127.) Natalie immediately noticed that Petitioner was holding her plastic Subway cup, which she always kept filled with water on the desk next to the cash register. (LD #9 at 98, 103.) Natalie also noticed another plastic cup from Subway, filled with green soda and a red straw, sitting on the front of the counter. (LD #9 at 98, 103.) Natalie stared at Petitioner, wondering why he was holding her water cup. (LD #9 at 100.) Petitioner reacted by pointing to some of the tanning equipment around the room and repeatedly asking, "What's that?" (LD #9 at 100-01.) Petitioner did not ask for any tanning services or inquire about the prices for those services. (LD #9 at 101.) Feeling "weird" about the situation, Natalie started to back away from Petitioner. (LD #9 at 100-01.)

Within seconds of hearing voices, Jason entered the office and walked into the lobby to see if everything was alright. (LD #9 at 165-66.) Just then, Petitioner opened the front door and walked outside. (LD #9 at 100, 166, 181.) Petitioner was still holding Natalie's water cup, leaving behind the other cup filled with green soda and a straw. (LD #9 at 98, 103.) Jason recognized Petitioner from earlier that day, when Jason had seen Petitioner waving an advertising sign at the nearby intersection of Lone Tree Boulevard and Blue Oaks Boulevard. (LD #9 at 166-67, 173, 181-82, 191.) Jason had also seen Petitioner that afternoon leaving the Subway located next door to the tanning salon. (LD #9 at 166-67, 173, 181-82, 191.)

As soon as Petitioner left, Natalie walked over to the register and opened the drawer. (LD #9 at 100.) She discovered that all of the $5 bills and $20 bills were missing. (LD #9 at 102, 168.) Natalie told Jason, "We've been robbed." (LD #9 at 104, 168.) Jason walked outside to track down Petitioner, while Natalie picked up the phone and dialed the police. (LD #9 at 104, 168.)

The call was received by the Rocklin Police Department at 2:08

4

p.m. (LD #9 at 194.)

Jason spotted Petitioner just as he was walking around the corner of the building. (LD #9 at 168-69.) Petitioner briefly turned around and saw Jason. (LD #9 at 169.) Petitioner continued walking away, and Jason ran after him. (LD #9 at 169.) Jason next spotted Petitioner walking across the street at the intersection of Lone Tree Boulevard and Blue Oaks Boulevard, the same intersection where Petitioner had been waving the advertising sign earlier that morning. (LD #9 at 169-70, 191.) Jason's car happened to be parked nearby, so he got inside and drove over to Petitioner. (LD #9 at 170.)

After parking his car, Jason stepped outside and reluctantly approached Petitioner. (LD #9 at 170-71.) At that time, Petitioner was loading his advertising sign and lunch box into a blue Thunderbird, which was parked just in front of Jason. (LD #9 at 171, 203, 228.) Jason said to Petitioner, "I know that you robbed us." (LD #9 at 171.) Petitioner responded, "I didn't rob you. I work really hard for my money. I don't have to rob anybody." (LD #9 at 171.) Jason replied, "But we know that you robbed us. You were the last person in with—the last half hour. Nobody else has been in for that time, and you are the only one in there." (LD #9 at 171.) Petitioner answered, "I'll show you I didn't rob you." (LD #9 at 172.) Petitioner, accompanied by Jason, walked back across the street to the salon. (LD #9 at 172.)

When they returned, Natalie was still on the phone with the police. (LD #9 at 104, 172.) Petitioner asked Natalie and Jason why they believed he had robbed them. (LD #9 at 172.) Jason responded that Petitioner had been the only one in the store, and Natalie added that Petitioner had been standing next to the cash register. (LD #9 at 173.) Petitioner said, "Ma'am, I did not rob you." (LD #9 at 105, 172.) Petitioner pointed to the camera on the wall and said, "Check the video." (LD #9 at 130, 183.) Then Petitioner removed numerous items from his cargo-pants pockets and placed the contents on the counter. (LD #9 at 105-06, 173.) There was no money among the contents. (LD #9 at 106, 173-74.) When Jason asked to see Petitioner's back pockets, Petitioner insisted they were already empty. (LD #9 at 174.) Natalie interjected, "It doesn't matter. The police are on their way." (LD #9 at 106, 131, 174.) At that point, Petitioner quickly gathered his belongings from the counter and hurriedly exited the salon. (LD #9 at 106, 132, 174-75.)

Natalie continued to stay on the phone waiting for the police to arrive, while Jason again followed Petitioner. (LD #9 at 106-07, 175.) Petitioner walked at a brisk pace all the way across the intersection, then stepped into his blue Thunderbird, and hurriedly drove away, even running a red light. (LD #9 at 175-76.) Jason also returned to that intersection, where his own car was still

parked, and he got inside and drove off after Petitioner. (LD #9 at 175-77.) Using his cell phone, Jason continued following Petitioner and reported the location and license plate of Petitioner's car to the Rocklin Police Department. (LD #9 at 178, 234.)

Patrol cars soon appeared and conducted a traffic stop on Douglas Boulevard near the I-80 freeway. (LD #9 at 179, 206.) Petitioner was advised that he was suspected of theft and asked to exit his vehicle. (LD #9 at 207.) Petitioner complied, while still holding a cell phone in one hand and a crumbled $20 bill in the other. (LD #9 at 207, 210.) Petitioner eventually consented to a search of his person and vehicle. (LD #9 at 207-08, 210.) Officers discovered waded [sic] up cash stuffed behind the ash tray in the center console of Petitioner's car. (LD #9 at 213, 215.) The total amount of money seized from Petitioner's person and vehicle amounted to $172, consisting of seven $20 bills, six $5 bills, and two $1 bills. (LD #9 at 219-20.) Officers also noticed a plastic Subway cup filled with a clear liquid that may have been water. (LD #9 at 208.)

Jason, who had observed the entire traffic stop, approached the officers and identified Petitioner as the thief. (LD #9 at 179-80.) Beforehand, Jason had called Natalie on his cell phone, and she had initially estimated that between $130 and $150 had been stolen. (LD #9 at 184, 186.) Natalie handled all of the accounting for the salon. (LD #9 at 185.) Based upon this initial estimate from Natalie, Jason told the officers that $130 was missing from the salon. (LD #9 at 184-86.)

Meanwhile, Rocklin Police Officer Adrian Passadori arrived at the tanning salon and spoke to Natalie about the theft. (LD #9 at 189, 194.) Natalie appeared to be "a little shaken up." (LD #9 at 200.) Officer Passadori had also passed by Petitioner just as Petitioner entered his car and drove away. (LD #9 at 190-92.) At Officer Passadori's prompting, Natalie estimated the amount taken in the theft to be $157. (LD #9 at 196, 200.) Natalie arrived at this particular estimate by mentally adding the amount of cash transactions for the day, without actually counting up the drawer or consulting her accounting records while in the officer's presence. (LD #9 at 196, 200-01.) Officer Passadori did not want Natalie to touch the register in the hope of recovering fingerprints. (LD #9 at 196.)

The accounting records from the tanning salon subsequently confirmed that $136 had been stolen from the register. Specifically, as Natalie explained at trial, each morning the cash register is stocked with $100 in cash in various denominations to be used for change throughout the day. (LD #9 at 134, 142-43.) When Natalie finally counted the cash register after the theft, just $55 "and some change" remained. (LD #9 at 134.) According to the accounting records, a customer paid $31 in

cash for services on the morning of the theft and another paid $60 in cash around noon. (LD #9 at 148, 160, 161-62.) Another customer paid by credit card at 1:24 p.m., which was the last time Natalie opened the register drawer and personally observed all of the cash bills inside. (LD #9 at 113-14.) At 1:44 p.m., another customer entered the salon for a tan without being charged. (LD #9 at 113, 151.) Other than Petitioner's appearance at approximately 2:00 p.m., no other customers entered the salon until 2:58 p.m., when that customer paid $19.99 in cash for a tanning service. (LD #9 at 113-14, 151, 160-62.) At the time of this final cash transaction, officers were still present in the salon investigating the theft. (LD #9 at 113-14.)  Thus, the records reveal that $136 in cash was missing from the register at the time of the theft. However, Natalie later estimated the loss at $155, evidently by erroneously including the posttheft cash transaction of $19.99, and then she recorded that same estimate as a loss in the accounting records. (LD #9 at 140, 153-55.)

Officer Passadori soon transported Natalie to the location of the traffic stop to conduct a field show-up. (LD #9 at 134, 197.) Natalie readily identified Petitioner. (LD #9 at 197.) Solely based on Natalie's estimate of the amount stolen, one of the officers handed Natalie $127 in cash that had been recovered from Petitioner's car. (LD #9 at 134-35, 198.)[5] Consequently, police retained $45 of the total seized cash from Petitioner's possession.

A crime scene technician arrived at the tanning salon to check the register and plastic cup for fingerprints. (LD #9 at 225-27.) Four prints were recovered from the cup, but none matched Petitioner. (LD #9 at 226-27.) It was still possible that Petitioner had touched the cup without leaving a fingerprint. (LD #9 at 227.) No fingerprints were recovered from the register. (LD #9 at 225.)

After the field show-up, Petitioner was arrested and transported to the local jail. (LD #9 at 240.) While there, he made two recorded telephone calls to his daughter Cedilla. (LD #9 at 238, 241, 281; LD #11 [exhibit list]; LD #12 [DA's copy of Exhibit 13]; LD #13 [DA's copy of Exhibit 14].) In the first call made at 7:36 p.m. on June 30, 2007, Petitioner admitted that he was "in

---

[5]  Petitioner argues that the officer handed Natalie $172, not $127.  (Dkt. No. 32 at 2-3.) Petitioner claims his figure is "a matter of record," but does not indicate where the record supports his figure.  Petitioner also appears to argue here that by handing the victim the recovered money, the officer violated Section 1412 of the Code of Criminal Procedure.  New claims raised in response to the answer may not be considered by this court.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th  Cir. 1994) (a traverse is not the proper pleading to raise additional grounds for relief); Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued specifically and distinctly in a party's opening brief").

trouble" because "I did something stupid, and they caught me."
(LD #9 at 238-41, 279; LD #13 at 1.) In the second call made just
twenty minutes later at 7:55 p.m., Petitioner added, "I was out
working a day, and I just made a bad, bad decision, man. I'd [sic]
lose everything for that choice that I made." [LD #9 at 280-83; LD
# 11 at 4.)[6]

**Defense**

In his defense, Petitioner called Summer Barr, the assistant
manager of a temporary employment agency. (LD #9 at 274.) Barr
testified that Petitioner had been employed on June 30, 2007, as a
"sign shaker" at the intersection of Blue Oaks and Lone Tree
Boulevard. (LD #9 at 275.) Barr added that Petitioner had been so
employed for twelve days. (LD #9 at 276-78.) Barr noted that
employees are generally given a paycheck at the end of each day.
(LD #9 at 276-78.) Petitioner still had one paycheck waiting for
him to collect. (LD #9 at 276.)[7]

(Dkt. No. 30 at 4-10.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a

judgment of a state court can be granted only for violations of the Constitution or laws of the

United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

////

---

[6]  Petitioner challenges this aspect of the facts by asserting that respondent "has made a
desperate attempt to alter the truth by . . . reading into telephone conversations without any
respect or concern for the truth."  (Dkt. No. 32 at 1.)  However, petitioner does not claim he did
not make the statements, nor does he provide an explanation for them.

[7]  Petitioner claims respondent's counsel "has made a desperate attempt to alter the truth
by omitting figures (Additional check stubs, see Exhibit A-1 attached)."  (Dkt. No. 32 at 1.)  This
recitation of the facts includes only those facts adduced at trial.  Petitioner did not introduce the
check stubs at trial.  In fact, one of petitioner's claims alleges his due process rights were violated
because he was precluded from doing so.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court

1  adjudicated the claim on the merits in the absence of any indication or state-law procedural

2  principles to the contrary." <u>Harrington</u>, 131 S. Ct. at 784-85.  That presumption may be

3  overcome by a showing that "there is reason to think some other explanation for the state court's

4  decision is more likely." <u>Id.</u> at 785 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)).

5           Where the state court reaches a decision on the merits but provides no reasoning

6  to support its conclusion, the federal court conducts an independent review of the record.

7  "Independent review of the record is not de novo review of the constitutional issue, but rather,

8  the only method by which we can determine whether a silent state court decision is objectively

9  unreasonable." <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

10  decision is available, the habeas petitioner has the burden of "showing there was no reasonable

11  basis for the state court to deny relief." <u>Harrington</u>, 131 S. Ct. at 784.  "[A] habeas court must

12  determine what arguments or theories supported or, . . . could have supported, the state court's

13  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

14  arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at

15  786.

16  V.  <u>Petitioner's Claims</u>

17           Petitioner raises four claims, most of which contain a number of subclaims, in his

18  petition.  They are: (a) due process violations for the denial of the right to introduce evidence,

19  denial of the right to call witnesses, the state's presentation of false evidence and suppression of

20  exculpatory evidence, the failure to provide an opportunity to comment on the presentence

21  report, and denial of petitioner's <u>Romero</u> motion; (b) ineffective assistance of counsel for failure

22  to conduct numerous investigations, including of the video tapes in the tanning salon and

23  neighboring Subway, failure to introduce evidence and witnesses, and tampering with

24  petitioner's mail; (c) numerous assertions of constitutional error based on the arresting officer's

25  seizure of petitioner's money; and (d) denial of the right to appeal based upon a plea agreement.

26  ////

A.  Denial of Right to Appeal - Claim 4

          Petitioner alleges here that he was forced to waive his right to appeal.  (Dkt. No. 1 at consecutive p. 5.)  He does not elaborate in his federal petition.  After trial but prior to sentencing, the district attorney offered petitioner a stipulated sentence of five years, eight months if he would waive his right to appeal.  (LD 4 at 2.)  The superior court summarized the procedural background of this claim as follows:

> At the sentencing hearing, the trial court informed the petitioner that the court would likely impose the mid-term and sentence the defendant to seven years, thus he was saving over a year and a third by accepting the District Attorney's offer.  [rt 6:2-7]  The trial court informed the petitioner that he could accept the offer or reject it and offered to give the petitioner more time to talk with his attorney.  [rt4:1-3]  The defendant was informed that his waiver would include everything that occurred pretrial, during trial also sentencing.  [rt 7:1-24]  The defendant acknowledged that he understood the consequences of the waiver and he expressly agreed to and did waive his appellate rights.  [rt 7:1-24]

(LD 4 at 2.)

          1.  Factual Background

          Petitioner appeared for a sentencing hearing on January 2, 2008.  (LD 2 at 1.)  The court first noted that there was an off-the-record discussion between the attorneys.  (LD 2 at 2.)  Respondent states, and the Superior Court's opinion reflects, that petitioner was faced with a maximum sentence of at least nine years.[8]  (Dkt. No. 30 at 11:24; LD 4 at 1.)  However, the state trial record reflects that petitioner was told he could face the "upper term," which was not specified, and that the judge would "have to struggle to give you the midterm.  And that means seven years."  (LD 2 at 3:10-12.)  It is not clear from the trial transcript that petitioner understood he faced a nine-year sentence.  However, in his state habeas petition filed in the Placer County Superior Court, petitioner explained that he had not raised his claim on appeal because "I was

_____

          [8]  In the Answer, respondent states several times that by his calculation, petitioner faced a much longer maximum sentence.  (Dkt. No. 30 at 3 n.2, 12 n.6.)  Respondent's speculation regarding petitioner's sentence is not part of the trial record and is therefore not a consideration in this court's review of petitioner's claims.

forced to waive my appeal rights or face nine (9) years in prison." (LD 3 at consec. p. 5; see also
Dkt. No. 1 at consec. p. 3.)   Whether petitioner understood his risk to be a nine-year sentence or
a seven-year sentence makes no difference to this court's analysis of the voluntariness of his
waiver of the right to appeal.

Petitioner initially moved to dismiss the Three Strikes findings under People v.
Superior Court (Romero), 13 Cal. 4th 497 (1996). (LD 1 at 1; LD 2 at 3.)  The trial judge
mentioned that he had limited discretion under Romero. (LD 2 at 4.)  He went on to clarify to
petitioner that accepting the district attorney's offer of five years, eight months meant giving up
his Romero motion. (LD 2 at 4:15-18.)  The court reminded petitioner of the prosecution's offer
for the low-term of "five years, eight months" in exchange for a waiver of petitioner's "right to
appeal." (LD 2 at 3:12-17.)  The court inquired whether petitioner wanted to accept the offer.
(LD 2 at 4.)

Petitioner next indicated that he wanted to speak to his family, then he asked
whether he could contradict some of the aggravating factors listed in the probation report. (LD 2
at 4:22-5:2.)  The court tried to get petitioner's attention to make clear that petitioner understood
he was waiving his right to appeal.  (LD 2 at 5:3-5, 7:3-4.)  After taking a break to permit
petitioner to talk with his family, the district attorney clarified that petitioner's waiver "would
 include the waiver of everything that occurred pretrial, during trial and also for sentencing."
(LD 2 at 7:10-12.)  Petitioner asked the judge: "Does that have to be the – what happened before
trial has to be – I can't appeal no parts of this process?" (LD 7:14-15.)  The judge made clear,
"No appeals." (LD 2 at 7:16.)  Petitioner then agreed on the record to the offer. (LD 2 at 7:21-
22.)  His counsel joined in the agreement. (LD 2 at 7:25-27.)   The judge looked to petitioner's
wife and asked, "You talk him into it?" (LD 2 at 8:1-2.)  She replied, "Yes." (LD 2 at 8:3.)

The record indicates petitioner was still extremely upset after agreeing to take the
offer. (LD 2 at 8:3-19.)  The judge explained further that he had little discretion to strike
petitioner's prior strikes and that "a Romero Motion would not be granted. . . .  That's my initial

1    impression." (LD 2 at 9:27-10:1.)    The judge then proceeded to sentence petitioner in

2    accordance with the agreement to five years and eight months imprisonment.  (LD 2 at 10-11.)

3               2.  <u>State Court Decision</u>

4               Because neither the Court of Appeal nor the California Supreme Court issued an

5    explained decision, this court looks through those decisions to the Superior Court's decision as

6    the "last reasoned state court decision" and the "basis for the state court judgment."  <u>Avila v.</u>

7    <u>Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  The Superior Court's ruled on petitioner's claim that

8    his waiver was coerced as follows:

9             . . . . Thus, the defendant received the benefit of the bargain,
             namely, a reduced sentence in exchange for his waiver of appellate

10         rights.

11              By waiving his appellate rights, the petitioner waived his
             right to complain about the effectiveness of his attorney during the

12         trial.  The intent of both parties was to waive any appeal and this
             would also include a Writ of Habeas Corpus.  The Petitioner's

13         waiver appears to have been made of his own  free will and was
             not coerced.  Additionally the Petitioner could have, but did not,

14         file an appeal to the appellate court alleging that his waiver as
             defective.

15

16              Accordingly, because the Petitioner has waived his right to
             appeal, the Petitioner's petition for Writ of Habeas Corpus is

17         DENIED.

18    (LD 4 at 2-3.)

19               3.  <u>Analysis</u>

20               It is not a due process violation for a defendant to waive, in an otherwise valid

21    plea agreement, his statutory right of appeal.[9]  <u>United States v. Navarro-Botello</u>, 912 F.2d 318,

22

23           [9]  Respondent contends petitioner's claim is not cognizable in this habeas proceeding
because he did not specify a constitutional violation in claim 4.  (Dkt. No. 30 at 13-14.)

24    According to respondent, because a state is not required by the Federal Constitution to provide a
right to appeal, being coerced to waive that right does not state a constitutional claim.  (<u>Id.</u>)

25    However, courts have frequently held that an appellate waiver must be "knowing, voluntary, and
intelligent."  <u>E.g.</u>, <u>United States v. Hernandez</u>, 242 F.3d 110, 113 (2nd Cir. 2001).  Because the

26    state court specifically ruled that petitioner's waiver "was made of his own free will and not

321 (9th Cir. 1990).   Because the right to appeal is a statutory, not a constitutional, right, it is not clear that waiver must meet the same due process standards of being knowing and voluntary that apply to waivers of constitutional rights.  Id.   However, a number of courts have used that standard in determining the validity of a waiver of appellate rights.  E.g., United States v. Joyce, 357 F.3d 921, 922 (9th Cir. 2004).  "This court looks to the circumstances surrounding the signing and entry of the plea agreement to determine whether the defendant agreed to its terms knowingly and voluntarily." United States v. Baramdyka, 95 F.3d 840, 843 (9th Cir. 1996).  A review of the proceedings surrounding petitioner's waiver of his appellate rights shows that the superior court's finding that he knowingly and voluntarily waived his right to appeal was not "contrary to, or involved an unreasonable application of, clearly established Federal law" nor was it "based on an unreasonable  determination of the facts."

The record demonstrates that petitioner fully understood he was giving up all rights to challenge the trial proceedings.  In fact, petitioner's agitation and anger during the sentencing hearing appear to have been largely a result of that realization.  The trial judge clearly told petitioner that if he accepted the district attorney's offer, he would be waiving his right to appeal (LD 2 at 3:16-17, 7:4-5), he would be unable to proceed with his Romero motion (LD 2 at 4:15-18), and he would not be able to challenge anything in his probation report (LD 2 at 4:27-5:5).  The district attorney specified that petitioner would be waiving "everything that occurred pretrial, during trial and also for sentencing."  (LD 2 at 7:10-12.)  Petitioner asked for clarification, "I can't appeal no parts of this process?"  (LD 7:15.)  The judge told him, "No appeals."  (LD 7:16.)  When asked if he agreed to that deal, petitioner responded, "Yes."  (LD 7:21-22.)

It is not clear just why petitioner feels he was "coerced" into accepting the district attorney's offer.  To the extent he simply argues that the offer was in and of itself coercive, he

coerced," and because petitioner's claim of coercion sounds in due process, this court will consider it.  As discussed below, petitioner cannot succeed on the claim in any event.

1    does not state a federal claim.  A forced choice between asserting a constitutional right and

2    accepting a plea offer, while undoubtedly difficult, is not unconstitutional.  United States v.

3    Montilla, 870 F.2d 549, 553 (9th Cir. 1989); United States v. Brooklier, 685 F.2d 1208, 1216

4    (9th Cir. 1982).  Accordingly, claim 4 is denied.

5        B. Petitioner's Remaining Claims

6            Petitioner's remaining claims fall under three constitutional categories: (1) due

7    process violations; (2) Sixth Amendment violations for the ineffective assistance of petitioner's

8    trial counsel; and (3) equal protection violations.  The Superior Court held it could not consider

9    petitioner's remaining claims because he had waived his right to any appeal, which included the

10   right to seek relief by way of habeas corpus.  (LD 4 at 3.)  Respondent refers to this application of

11   the waiver as a "procedural bar" and argues the federal court may therefore not consider the

12   claims under the procedural default doctrine.  (Dkt. No. 30 at 16-18.)  Typically, a "procedural

13   bar" is a rule regarding the time for or manner of raising a claim in state court.  2 R. Hertz & J.

14   Liebman, Federal Habeas Corpus Practice and Procedure 1404 n.2 (6th ed. 2011).  Petitioner's

15   appellate waiver is not that sort of a state court procedural rule and the procedural default

16   doctrine should not apply.  However, even if petitioner's claims can be considered subject to the

17   procedural default doctrine, this court may examine the merits of those claims in the interests of

18   judicial efficiency.  Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (a district court may address

19   the merits without reaching procedural issues where the interests of judicial economy are best

20   served by doing so); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar

21   issues are not infrequently more complex than the merits issues presented by the appeal, so it

22   may well make sense in some instances to proceed to the merits if the result will be the same.").

23   The court finds petitioner cannot succeed on the merits of these remaining claims.

24           Respondent recognizes an additional problem.  (Dkt. No. 30 at 18-19.)  Under

25   federal law, a waiver of only appellate rights does not include a waiver of the right to seek relief

26   on habeas corpus.  United States v. Pruitt, 32 F.3d 431, 433 (9th Cir. 1994) ("A plea agreement

15

does not waive the right to bring a § 2255 motion unless it does so expressly. The government

gets what it bargains for but nothing more."). Accordingly, the superior court's application of

petitioner's appellate wavier to his habeas corpus claims may have been an unreasonable

application of federal law.[10]  In that case, or even if this court simply considers that the Superior

Court decided the case on procedural grounds rather than the merits, this court may review these

claims de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003). However, even under this

most generous standard of review, petitioner's claims fail.

          1. Due Process

          Generally, due process protects a defendant's right to a fundamentally fair trial.

See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20

(9th Cir. 1991). To violate the constitutional due process protections, any error must have had a

"substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

Abrahamson, 507 U.S. 619, 623 (1993). Petitioner has not shown such an effect with respect to

any of his claims of error.

          Petitioner first contends he was prohibited from presenting his paycheck stubs as

evidence showing he had been paid recently and prevented from putting on the testimony of

witnesses who knew he had money that day. (Dkt. No. 1 at consec. p. 4; Dkt. No. 32 at 1.)

There are numerous problems with petitioner's allegations. First, the trial record does not show

that petitioner was denied the right to present this evidence. Second, even if petitioner was

denied that right, he has not described who the possible witnesses are or how they would have

testified. Admittedly, he did present to the state court and includes with his filings herein copies

of pay stubs. However, that evidence would not have affected the outcome of petitioner's trial.

---

[10]  It may also be possible to look at the Superior Court's determination as reasonable. The Superior Court could have determined that the district attorney's clarification that petitioner would be waiving "everything that occurred pretrial, during trial and also for sentencing," (LD 2 at 7:10-12), was intended by both parties to include a waiver of habeas corpus. As discussed in the text, because petitioner cannot succeed even with a de novo review of his claims, it is not necessary for this court to make that determination.

Petitioner was able to get the pay stub information to the jury through the testimony of his employer, Summer Barr. Ms. Barr testified at trial that petitioner had been employed on a temporary basis for twelve days before his arrest, that temporary employees were paid daily, and that petitioner had picked up all but one of his paychecks. (LD 9 at 276-78.) Thus, the jury heard evidence that petitioner's job could have been the source of the money in his possession on the day of the crime. The pay stubs would have been redundant of Ms. Barr's testimony that petitioner had recently been paid. Even if petitioner was somehow prevented from presenting the pay stub evidence, he has not shown that admission of the evidence would have had any effect on the outcome of his trial.

Petitioner next argues the arresting officer violated his due process rights when he gave the victim money found in petitioner's possession. He claims the officer thus "created evidence" by assuming petitioner's guilt.[11] (Dkt. No. 1 at consec. p. 4; Dkt. No. 32 at 1.) As respondent points out, the fact that the officer turned the money over to the victim based solely on her uncorroborated claim of theft was brought out by the defense at trial. (LD 9 at 197-99.) Moreover, there was plenty of evidence besides the officer's assumption of guilt to establish petitioner committed a theft. Both owners of the tanning salon identified petitioner as the only person to have entered their salon in the half-hour before the theft occurred. (LD 9 at 99, 173.) After petitioner left the salon, the owners discovered that their cash register was missing all of its five and twenty dollar bills. (LD 9 at 102, 168.) They told the police that they believed their loss was about $130. (LD 9 at 184-86.) When the police apprehended petitioner shortly afterwards, he had $172 in cash, comprised of seven $20 bills, six $5 bills, and two $1 bills. (LD 9 at 219-

---

[11] In his reply, petitioner also argues the officers failed to follow state law requirements for taking property from an arrestee. (Dkt. No. 32 at 2.) Violations of state law are not cognizable on habeas corpus. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Further, this court may not consider a claim raised for the first time in a reply brief or traverse. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (a traverse is not the proper pleading to raise additional grounds for relief); Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued specifically and distinctly in a party's opening brief").

20.)  Some of that money was found stuffed behind the ashtray in the center console of

petitioner's car.  (LD 9 at 213, 215.)  Finally, petitioner made comments in post-arrest telephone

calls to his daughter that appeared to be admissions of guilt.[12]  (LD 9 at 238-41, 279, 280-83.)

Petitioner has not shown the officer's actions affected the fundamental fairness of his trial or

otherwise violated his due process rights.

Petitioner's final due process argument is that he was denied the opportunity to

comment on the presentence investigating report or have his Romero motion heard.  However, as

discussed above, petitioner waived those rights when he agreed to sign the stipulated sentencing

agreement.  As discussed above, the fact that petitioner's choice between taking the sentencing

deal or proceeding with the challenges to his trial and sentence was a difficult one does not make

it unconstitutional.  United States v. Montilla, 870 F.2d 549, 553 (9th Cir. 1989); United States v.

Brooklier, 685 F.2d 1208, 1216 (9th Cir. 1982).

2.  Ineffective Assistance of Counsel

Again, regardless of whether or not any procedural default rule applies here,

petitioner's claims of ineffective assistance of counsel cannot succeed on their merits.[13]

The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

---

[12]  Petitioner complains that respondent submitted herein uncertified copies of the transcripts of the telephone conversations that were introduced at trial.  (Dkt. No. 32 at 1.)  He also argues that respondent is guilty of "reading into telephone conversations without any respect for the truth."  (Id.)  However, petitioner does not specify how the statements quoted by respondent from those transcripts differed from the tape recording played to the jury or the transcripts of the telephone conversations that were admitted at trial.

[13]  Petitioner also claims in numerous places in his pleadings that the trial court erred in denying his motions to replace his trial attorney pursuant to People v. Marsden, 2 Cal. 3d 118 (1970).  Petitioner also complains that he does not have access to transcripts of the Marsden hearings.  Because petitioner has not shown that his counsel acted unreasonably or otherwise inappropriately, he has not shown any need for discovery of the transcripts or any prejudice as a result of the trial court's denial of his motions.

1  counsel, a petitioner must first show that, considering all of the circumstances, counsel's

2  performance fell below an objective standard of reasonableness.  Id. at 687-88.  Second, a

3  petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland,

4  466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

5  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

6  694.   "[A] court need not determine whether counsel's performance was deficient before

7  examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . . If it

8  is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . .

9  that course should be followed."  Strickland, 466 U.S. at 697.

10         Petitioner first argues counsel unreasonably failed to investigate and present

11  surveillance videotapes from the tanning salon, the Subway restaurant where petitioner had lunch

12  and "pulled out my money to pay [the] cashier," and surrounding businesses.  (Dkt. No. 1 at

13  consec. p. 4.)  Petitioner has not shown reason to believe such surveillance tapes exist or,

14  assuming they do, that they would show other people entering the tanning salon or that he had

15  money to pay for lunch at Subway.  Petitioner has not shown he was prejudiced by any failure on

16  his counsel's part to investigate and present this speculative evidence.

17         Petitioner next argues counsel failed to challenge tanning store owner Ms.

18  Rankin's veracity by arguing that she testified she could not hear the door chime around the time

19  petitioner entered the tanning salon because she was in the back of the store.  However, the jury

20  heard that testimony.  (LD 9 at 155-56.)  Further, Mr. Rankin testified that he heard the door

21  chime when petitioner entered.  (LD 9 at 164-65, 186-87.)  And, Ms. Rankin heard a "bang" that

22  sounded like the cash register drawer being opened.  (LD 9 at 97, 99-100.)  That "bang" caused

23  Ms. Rankin to walk to the front of the store to investigate.  (LD 9 at 97-98.)  Upon entering the

24  lobby, she observed petitioner "walking out" from behind the counter near the desk.  (LD 9 at 98-

25  99, 124-25, 127.)  Whether or not petitioner's trial attorney should have made an issue out of Ms.

26  Rankin's inability to hear the door chime, the failure to do so did not affect the outcome of

19

petitioner's trial.  There was more than sufficient additional evidence to show that petitioner was the only person to have entered the store during the time period the money was taken and to show that he took the money.

Petitioner objects to counsel's representation on a number of additional grounds. He claims counsel (a) should have objected to the arresting officer's actions, (b) violated his trust by giving a copy of petitioner's letter to the ACLU to the district attorney, (c) allowed petitioner's hands to be cuffed during the pretrial exam, and (d) refused to call witnesses or present the pay stub evidence.  (Dkt. No. 1 at consec. p. 4.)  Again, even assuming counsel's conduct was unreasonable, which petitioner has not shown, petitioner has not demonstrated how he was prejudiced by that conduct.  None of these challenges goes to the strong evidence at trial establishing petitioner's guilt.  Petitioner has not shown a "reasonable probability" that the result of his trial would have been different had counsel acted differently.  Strickland, 466 U.S. at 694. Petitioner's claims of ineffective assistance of counsel are denied.

3. Equal Protection

Petitioner cannot succeed on the merits of this claim.  Petitioner appears to argue that the arresting officer violated petitioner's right to equal protection of the law by turning over money to the victim based solely on her word, without proof.  The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race."  Whren v. United States, 517 U.S. 806, 813 (1996).  While the record indicates petitioner is African-American, he provides no reason to believe the officer's actions were based on petitioner's race or upon any other basis covered by the Equal Protection Clause.  Accordingly, petitioner's Claim 3 is also denied.

////
////
////
////

20

For the reasons set forth above, it is hereby ORDERED as follows:

1. Petitioner's January 3, 2011 request for the appointment of counsel, Dkt. No. 27, lacks the requisite showing of exceptional circumstances and is denied;

2. Petitioner's July 20, 2009 application for a writ of habeas corpus is denied; and

3. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability should not issue in this action.

DATED:  June 28, 2011

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

conner1994.final or